UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* | ) | |
| | ) | |
| PENNY SUE MYKYTKA AND | ) | |
| MICHAEL MYKYTKA | ) | |
| 12435 344th Avenue | ) | |
| Twin Lakes, Illinois 53181 | ) | **COMPLAINT** |
| | ) | **FILED UNDER SEAL** |
| Plaintiff, | ) | PURSUANT TO |
| | ) | 31 U.S.C. §3730(b)(2) |
| BRINGING THIS ACTION ON BEHALF | ) | |
| OF THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| UNITED STATES ATTORNEY | ) | |
| Judiciary Center Building, | ) | |
| 555 Fourth Street, NW, | ) | |
| Washington, 20530 c/o John Greene | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE UNITED STATES | ) | |
| U.S. Department of Justice | ) | |
| 10th and Constitution Avenues, N.W. | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NORTHROP GRUMMAN CORPORATION | ) | **JURY TRIAL** |
| 300 M St SE Suite 350 | ) | **DEMANDED** |
| Washington, DC, 20003-3403 | ) | |
| | ) | |
| Defendant. | ) | |

This is a *qui tam* action under 31 U.S.C. Sec. 3729, *et seq.* of the False Claims Act filed by Relator/Plaintiffs Penny Sue and Michael Mykytka, in the name of the United States Government and themselves, to recover penalties and damages arising from Defendants' violations of federal requirements concerning contracts with agencies of the United States, specifically the Department of Defense Air Force.

## <u>JURISDICTION AND VENUE</u>

1.    Plaintiffs, Penny Sue and Michael Mykytka, hereby allege causes of action under 31 U.S.C. sections 3729 *et. seq*. of the False Claims Act, arising from Defendants' contracts with agencies of the United States Government, specifically the United States Air Force.

2.    Plaintiffs, Penny Sue and Michael Mykytka, are the original source of all the allegations contained in this Complaint.

3.    There has been no public disclosure of the allegations contained in this complaint.

4.    Pursuant to the requirements of the False Claims Act 31 U.S.C. § 3729, *et. seq*., the plaintiff has provided the government with a confidential disclosure statement and exhibits that substantiate his allegations.

5.    Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3732 and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

6.    The Defendants are in the business of providing services and material to the U.S. Government through its Defense Agencies and conduct business in Washington, DC.

7.     Defendant, Northrop Grumman Corporation, maintains offices in several locations, including at 300 M St SE Suite 350 Washington, DC, 20003-3403 and conducts business with Agencies of the U.S. Government as well as other government contractors in Washington, DC.

8.     Venue and jurisdiction are proper in the United States District Court, Washington, D.C. pursuant to 28 U.S.C. Section 1391(c) and 31 U.S.C. Section 3732 as the Defendant is a corporation subject to personal jurisdiction in Washington, DC.

## THE PARTIES INVOLVED

9.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

10.    Relator, Penny Sue Mykytka of 12435 344th Avenue Twin Lakes, Illinois 53181 is a professional in the defense industry with thirteen years of experience.

11.    She was employed by Northrop Grumman from June 2000 through January of 2002 and earlier from 1977 through 1985.

12.    Relator, Michael Mykytka of 12435 344th Avenue Twin Lakes, Illinois 53181 is a Project Manager with twenty four years of experience.  He worked for Northrop Grumman as a Manager of Operations Projects.

13.    None of the allegations presented herein have been publicly disclosed. The Relators are also the original source of the allegations contained herein.

14.    Defendant, Northrop Grumman Corporation with offices throughout the country including those at 300 M St SE Suite 350 Washington, DC, 20003-3403 employed Mr. Mykytka and Ms. Mykytka.

15.     The company is in the business of providing equipment and services to the Department of Defense.   The specific activities discussed herein, involved Northrop Grumman's charges for repairs and new parts in radar testing equipment provided to the United States Air Force.

## SUMMARY OF ALLEGATIONS

16.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

17.     Northrop Grumman knowingly, willfully, recklessly and systematically used scrapped and old parts in repairs of its radar testing equipment. The repairs made to the equipment were documented falsely.

18.     The Government including, but not limited to, the U.S. Air Force was billed by Northrop Grumman as if the company used new parts for repairs to radar testing equipment.

19.     The repairs and the bills for them, therefore, included thousands of individual false claims made to the United States.

## FACTS

### a.  Northrop Grumman Repairs and Services Radar Testing Equipment.

20.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

21.     At The Northrop Grumman facility in Rolling Meadows, Illinois the company serviced defense department projects including radar systems.

22.     Northrop Grumman repaired radar systems, which belonged to the United States Air Force as well as other customers including the Government of Saudi Arabia.

23.    The equipment serviced at this facility included radar testing modules, which are used to ensure that radar equipment and radar jammers function properly when used by the Air Force.

24.    Ms. Mykytka was initially assigned to work in a small stock room which was under the direction of Jeff Carrao administrator of the Automated Test Equipment group.

25.    This group repaired ground support test equipment and coordinated non-technical logistics.

26.    This particular stock room ("Carrao stockroom") was located in room #3511 of Northrop Grumman's facility.

### b. Carrao Stockroom Fails to Protect New Parts and Stores Old Junked Parts.

27.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

28.    Ms. Mykytka noticed that the Carrao stockroom's practices were inconsistent with her experience working in the industry.

29.    Ms. Mykytka learned about the practices, which centered in the Carrao stockroom and maintained personal surveillance of these practices from the beginning of her employment in July of 2000 until she left the company in 2002.

30.    The Carrao stock room and its operation remain under the control of the same Northrop Grumman management and the activity is ongoing.

31.   In July 2000,  Mr. Carrao showed Ms. Mykytka a stock cart containing 6-8 anti-static tote boxes about 10" X 18" comprised of various materials and smaller components. Smaller components were in small manila coin envelopes.

32.   Ms. Mykytka recognized the writing on these envelopes as that of former co-workers including some in her own hand writing from her previous period of work for Northrop in the 1980s.

33.   She observed one of the boxes containing Circuit Boards had torn packaging exposing circuitry, diminishing the Boards operability.

34.   Ms. Mykytka learned through her experience in the industry that parts had become increasingly sensitive.

35.   As a result, packaging became increasingly sophisticated. New parts were sealed in anti-static packaging to prevent compromising sensitive parts.

36.   Mr. Carrao directed Ms. Mykytka to incorporate old circuit parts into the stock room inventory.

37.   The Carrao stockroom had a stand alone computer, independent of other networks, for its inventory.

38.   This practice made it difficult, if not impossible, to trace which parts were used in a repair.

39.   Tracing which part may be used in a repair is important to maintain the quality of those repairs even if the parts used are new.

40.   The material in the Carrao stock room included old, scrap gathered from the Scrap Bin. Some parts even had Quality Assurance rejection stickers on them, which indicated the part had failed.

41.    Mr. Carrao asked Ms. Mykytka to enter information about the parts into inventory on the stand alone computer and to find an appropriate place in the stock room to put the parts.

42.    Ms. Mykytka inquired how the material was acquired.

43.    Mr. Carrao told her he retrieved the parts from the area behind the Model shop.

44.    He also stated they would return to retrieve more junked parts, when the present cart was emptied.

45.    Components were ordinarily sent to be scrapped out for their metal value in the "area behind the Model Shop" which was also known as the "Scrap Bin."

46.    Parts sent to the scrap bin had been determined by Quality Engineering Department to be useless or obsolete. Employees assigned to work in the Carrao stockroom broke down these parts in an effort to remove smaller component parts that could be for use in repairs.

47.    In the Carrao stockroom, new parts were not treated properly either.

48.    Many new parts were not sealed in anti-static envelopes or packaged at all creating damages to the new parts that were ordered.

49.    These practices made it more difficult to distinguish between old and new parts based only on their appearance and packaging. It also further compromised the quality of the repairs.

**c. Carrao Stock Room Assigned Dollar Values to Old Parts As If They Were New.**

50.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

51.    Mr. Carrao gave Ms. Mykytka inventory print outs listing parts removed by the Carrao group. Print outs assigned dollar amounts to parts. Old, junked parts were initially assigned the dollar value of zero.

52.    Mr. Carrao directed Ms. Mykytka to re-enter these parts with new dollar values.

53.    Mr. Carrao, his secretary, or other staff members would derive new costs for old parts from purchase orders, Fed Log, catalogues, and estimates.

54.    Then these new purchase values were assigned to old parts.

55.    Old parts entered into inventory with adjusted prices were re-used in repairs.

56.    Although these old parts were worthless, Carrao's team would charge clients, including the United States Air Force, prices based on new part costs.

57.    Old, scrapped parts with new part values would be used as though they were, in fact, new.

58.    A purchase order or invoice from a new part would be attached to the documentation for a repair and the new part would be returned to the stock.

59.    An old scrapped part taken from the Scrap Bin used in repair of a system would be assigned this purchase order to validate total repair cost for that system.

### d. Northrop Grumman Paperwork Deceived the DCAA.

60.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above

61.    Northrop Grumman charged the Government the cost of new parts while repairing systems with old parts of worthless or very minimal value.

62.     Northrop Grumman achieved this deception by systematically providing government officials with what is now the Defense Contract Audit Agency (DCAA), with falsified documents.

63.     Moreover, systems were repaired using old parts which, under the minimal testing circumstances, would appear stable.

64.     However, when these systems would be exposed to higher level of stress they could fail.

65.     The use of new parts was a material requirement in Northrop Grumman's repair of these systems.

66.     By using old, scrap parts, Northrop Grumman did not follow the procedures required to repair properly and completely government systems for government contracts.

67.     Instead, Northrop Grumman falsified the very documents intended to provide DCAA officials with enough information about the cost of repairs, in order to obtain approval for payment.

68.     Mr. Lou Kittler was the coordinator of charge accounts and a Technician.

69.     Mr. Kittler would determine which government contract would be charged for the repair.

70.     Then under the appropriate contract number he would initiate paperwork for the repair called an Operations and Repair Traveler ("O&R Traveler").

71.     An O&R Traveler is the Northrop Grumman document used to detail all activities conducted during the completion of repairs.

72.    It would be sent to Technicians or Engineers to state the work needed and determine what parts were needed to be replaced.

73.    The Carrao Group's Technicians or Engineers included Don Vica, Dexter Martin, and George Parchemenka.

74.    Technicians went to the Carrao stockroom and looked for the parts listed on the stand alone computer.

75.    If the part was available in the Carrao stockroom, Technicians would be given the part by Mary Yoo or physically remove the part from the stock room themselves and proceed to make the repair.

76.    If the part was not available in the Carrao stockroom the Technician would, instead,  bring the repair item to Carrao's Material Control Group which included Shirley Gariffa, Dave Seveska, and  Mary Yoo who requisitioned the material.

77.    The Material Control Group also requisitioned new parts to replace the old parts used in repairs and those requisitions were used to document the repairs when presented to the DCAA.

78.    A Carrao Material Control person could also obtain a part from another Northrop Grumman stockroom if it was available.

79.    If a part was not available through the stockrooms, the Control person could obtain a part through a Purchase Order. This purchase order would also be attached to the O&R Traveler.

80.    The fact that purchase orders were routinely attached to such documentation and some were legitimate would make it difficult for anybody who was not intimately aware of the deception to figure out when the Carrao people were attaching

purchase orders for parts, which were actually being shelved in their stock room and not being used in repairs paid for by the Government.

81.     Northrop Grumman's knowing deception and falsification of documents allowed them to use scrapped parts and simultaneously charge customers, including the United States Government, new part costs.

82.     An O&R Traveler would be presented to the Defense Contract Audit Agency (DCAA) for signature certifying all repairs and associated costs are proper.

83.     The DCAA was the government organization responsible for billing approval of the repairs made by Northrop Grumman.

84.     It would not be possible for DCAA to view the parts used in the repairs inside the Radar Testing Systems on any kind of a consistent basis to know whether new or old parts were used, even though the DCAA would be presented with paperwork, which made the repairs appear to be proper.

85.     The purchase orders for new parts attached to the Traveler appeared to validate part costs charged to the work order.

86.     A part used in the repair could be obtained from the scrap bin and not purchased from a supplier despite the Traveler's false documentation. The O&R Traveler submitted to DCAA would contain false information in an effort to obtain DCAA approval of costs.

87.     Moreover, DCAA oversight was limited to a review of the O&R Traveler and, in some cases, test results.

88.     DCAA would have needed to take apart the repaired system in order to match the purchase order's part number with part number of the part used in the repair.

89.    Unfortunately, testing of the repairs was limited in scope.

90.    Even a successfully completed test did not guarantee that the repaired equipment would work properly. Radar Testing Equipment might not properly test the Radar when the Radar testing equipment was not properly repaired. That information would make it impossible to see how the radar would perform under field operations.

91.    The Carrao stockroom's stand alone computer for its own inventory, coupled with fraudulent O& R Travelers further decreased the ability to trace material used in the Carrao stockroom.

92.    Parts used, of questionable capabilities, could not be tracked, because purchase orders and O&R Travelers were falsely assigned.

93.    Most troubling, such parts might appear to work under some conditions and fail under a load condition, which could put an entire Radar system at risk.

   **e. Ms. Mykytka Complains is Reassigned and Maintains Surveillance.**

94.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

95.    The Northrop Gruman practices discussed above alarmed Ms. Mykytka.

96.    In August of 2000, Ms. Mykytka complained about these practices.

97.    As a result Ms. Mykytka was re-assigned to another department to order and track all Capital (overhead) procurement for Engineering.

98.    During her continued tenure at Northrop Grumman, Ms. Mykytka continued to personally observe that the fraudulent practices conducted by the Carrao group were ongoing.

99.    Although Ms. Mykytka no longer worked in the Carrao stockroom, she continued to personally observe the persistence of fraudulent practices until her departure in 2002. These fraudulent practices continue to this day.

100.   In one instance, Ms. Mykytka observed a Carrao stockroom employee pull apart electronic circuit boards that came in for repair, were tested and deemed scrapped. Ms. Mykytka asked what he was doing.

101.   The employee said Carrao instructed him to remove the Integrated Circuits from the boards and put them into stock.

102.   Ms. Mykytka also took some contemporaneous notes of parts which were re-entered into the system as well as charge numbers for the parts.

## PREVIOUS DISCLOSURES TO THE GOVERNMENT

103.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

104.   On or about August of 2002, Ms. Mykytka provided Officials of the United States including Alex J. Pulles of the U.S. Defense Department Criminal Investigative Service and Daniel M. Boucek of the U.S. Department of Defense Office of Inspector General with inventory lists from the computer in the Carrao stockroom.

105.   In addition, consistent with the requirements of the False Claims Act 31 U.S.C. § 3729 *et. seq.*  a Disclosure Statement with exhibits setting forth the Relator's allegations was served on the Justice Department and the United States Attorney on January 19, 2007.

## VIOLATIONS OF THE FALSE CLAIMS ACT  31 U.S.C. § 3729 *et. seq.*

## COUNT I

106.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

107.    The defendant knowingly, willfully and recklessly made repairs under contracts with the Department of Defense using parts which were not proper.

108.    The above-named Defendant caused the submission of false claims in violation of 31 U.S.C. § 3729 *et. seq.*, by directly or indirectly causing the United States to be billed for work using parts that they knew to be improper.

109.    As a result of Defendant's fraudulent and or illegal conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars for faulty repairs pursuant to Government contracts.

110.    Damages to the Government include, but are not limited to, the full value of the contracts under which Northrop Grumman provided repairs to Radar Testing Equipment, plus any resulting damages which occurred because of the faulty operation of such equipment, plus the value of any parts which were charged to the government but not used in repairs.

## <u>COUNT II</u>

111.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

112.    The defendant knowingly, willfully and recklessly certified repairs to have been made properly under contracts with the Department of Defense including the Air Force, which were not properly repaired.

113.    The Defendant caused the submission of false claims in violation of 31 U.S.C. § 3729 *et. seq.*, by directly or indirectly causing the United States to be billed for

work using parts the Defendant knew to be improper while certifying the work as proper.

114.    As a result of Defendant's fraudulent and or illegal conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars for faulty repairs pursuant to Government contracts.

115.    Damages to the Government include, but are not limited to, the full value of the contracts under which Northrop Grumman provided repairs to Radar Testing Equipment, plus any resulting damages occurring, because of the faulty operation of such equipment, plus the value of any parts which were charged to the government but not used in repairs.

## COUNT III

116.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

117.    The Defendant knowingly, willfully and recklessly billed for repairs under contracts with the Department of Defense including the Air Force while claiming to use new parts in those repairs, when in fact, the Defendant used old junked parts in the repair work.

118.    The Defendant caused the submission of false claims in violation of 31 U.S.C. § 3729 *et. seq.*, by directly or indirectly causing the United States to be billed for work using old parts when they claimed to use new parts.

119.    As a result of Defendant's fraudulent and or illegal conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars for faulty repairs pursuant to Government contracts.

120.   Damages to the Government include, but are not limited to, the full value of the contracts under which Northrop Grumman provide repairs to Radar Testing Equipment, plus any resulting damages which occurred because of the faulty operation of such equipment, plus the value of any new parts which were charged to the government but not actually used in repairs.

## COUNT IV

121.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

122.   The Defendants knowingly, willfully and recklessly made repairs for the Department of Defense, including the Air Force, while claiming to use new parts in repairs when, in fact, the Defendant kept the new parts in its inventory, while substituting old parts for the repairs.

123.   The Defendant caused the submission of false claims in violation of 31 U.S.C. § 3729, *et. seq.* by directly or indirectly causing the United States to be billed for work using new parts which they kept while substituting old parts in the repairs.

124.   As a result of Defendant's fraudulent and or illegal conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars for faulty repairs pursuant to Government contracts.

125.   Damages to the Government include, but are not limited to, the full value of the contracts under which Northrop Grumman provide repairs to Radar Testing Equipment, plus any resulting damages occurring because of the faulty operation of such equipment, plus the value of any parts which were charged to the government but not used in repairs.

## COUNT V

126.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

127.   The Defendants knowingly, willfully and recklessly made repairs for the Department of Defense, including the Air Force, while claiming to use parts which were stored properly and handled properly in repair work when, in fact, the Defendant did not keep the parts in proper condition..

128.   The Defendant caused the submission of false claims in violation of 31 U.S.C. § 3729, *et. seq.* by directly or indirectly causing the United States to be billed for work using parts which they did not treat properly.

129.   As a result of Defendant's fraudulent and or illegal conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars for faulty repairs pursuant to Government contracts.

130.   Damages to the Government include, but are not limited to, the full value of the contracts under which Northrop Grumman provide repairs to Radar Testing Equipment, plus any resulting damages occurring because of the faulty operation of such equipment, plus the value of any parts which were charged to the government but not used in repairs.

WHEREFORE, plaintiff demands judgment for all of the following:

a)   That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendant's work on repair Contracts with the Department of Defense, including the Air Force which were not proper.

- 17 -

b)  That this Court enter a judgment against defendant in an amount equal to three times the amount of damages the United States Government has sustained because of defendant's work on repair contracts for the Department of Defense including the Air Force which defendant certified as being made properly.

c)   That this Court enter a judgment against defendant in an amount equal to three times the amount of damages the United States Government has sustained because of defendants work on repair contracts with the Department of Defense including the Air Force while claiming to use new parts and instead using old and junked parts.

d)   That this Court enter a judgment against defendant in an amount equal to three times the amount of damages the United States Government has sustained because of defendant's charging for new parts in repairs, which were not used in the repairs, but were kept by the defendants while using old junked parts in the repairs.

e)  That this Court enter a judgment against defendant in an amount equal to three times the amount of damages the United States Government has sustained because of defendant's charging for repair work using parts which were not stored properly and were damaged as a result of improper storage.

f)  That this Court enter a judgment against the defendant in an amount equal to three times the amount awarded to the defendant under contracts performed to provide repairs to the Department of Defense on those contracts, plus three times the amount of any damages resulting from faulty repairs plus a civil penalty of $5,000

to $10,000 for each violation of 31 U.S.C. section 3729 and or the Federal

Acquisition Regulations ("FARs") or any other applicable regulations.

g)   That Relator/Plaintiff be awarded punitive damages in an amount to be

determined by jury, which shall dissuade the defendant and others from similar

action;

h)   That Relator/Plaintiff be awarded all reasonable attorneys fees and costs, pursuant

to 31 U.S.C. § 3730 subsection (d) (1) (b) and subsection (d) (2) and (h).

i)   That in the event the United States Government continues to proceed with this

action, the Relator/Plaintiff be awarded an amount for bringing this action of at

least 15% but not more than 25% of the proceeds of any award or the settlement

of the claims;

j)   That in the event that the United States Government does not proceed with this

action, the Relator/Plaintiff be awarded an amount that the Court decides is

reasonable for collecting the civil penalty and damages, which shall be not less

than 25% nor more than 30% of the proceeds of any award or settlement;

k)   That the Relator/Plaintiff be awarded pre-judgment and post judgment interest;

l)   That a trial by jury be held on all issues;

m)  That the United States Government and the Relator/Plaintiff receive all relief both

at law and at equity, to which they may reasonably appear to be entitled.

**JURY TRIAL DEMANDED**

Respectfully submitted,

_____
Stephen M. Kohn
DC Bar No. 411513

_____
Michael D. Kohn
DC Bar No. 425617
_____/s/_____
David K. Colapinto
DC Bar No. 416390

KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, DC 20007-2756
Phone: (202) 342-6980
Fax:    (202) 342-6984

*Attorneys for Penny Sue and Michel Mykytka*

January 22, 2007

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I. (a) PLAINTIFFS

United States ex. rel.
Penny Sue Mykytka and Michael Mykytka

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Stephen M. Kohn, Michael D. Kohn, David K.
Colapinto (Kohn, Kohn & Colapinto, LLP)
3233 P Street NW Washington, DC 20007
Telephone: 202-342-0097

## DEFENDANTS

Northrop Grumman Corporation

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

ATTORNEYS (IF KNOWN)

CASE NUMBER   1:07CV00174

JUDGE: Richard W. Roberts

DECK TYPE: General Civil

DATE STAMP: 01/25/2007

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

◉ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZEN
FOR PLAINTIFF

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ◉ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. *Antitrust***

☐ 410 Antitrust

**○ B. *Personal Injury/Malpractice***

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. *Administrative Agency Review***

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. *Temporary Restraining Order/Preliminary Injunction***

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**◉ E. *General Civil (Other)*        OR        ○ F. *Pro Se General Civil***

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| O  G. *Habeas Corpus/ 2255* | O  H. *Employment Discrimination* | O  I. *FOIA/PRIVACY ACT* | O  J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| O  K. *Labor/ERISA (non-employment)* | O  L. *Other Civil Rights (non-employment)* | O  M. *Contract* | O N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  O 2 Removed from State Court  O 3 Remanded from Appellate Court  O 4 Reinstated or Reopened  O 5 Transferred from another district (specify)  O 6 Multi district Litigation  O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

This is a Complaint filed under seal pursuant to the False Claims Act 31 U.S.C. Section 3729 et. seq.  *Filed Under Seal*

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ _____  Check YES only if demanded in complaint  JURY DEMAND: YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE  1/34/07  SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

23

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.